# IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| LARRY KOLLER and TAMMY KOLLER, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 10-00261-CV-W-JTM |
| | ) |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

# ORDER

Two days before Christmas, in 2008, plaintiff Larry Koller was driving a tractor-trailer combination for his employer Yellow Transportation, Inc., in Texas County, Missouri. On that day, as Koller was traveling northbound on U.S. Highway 69, a vehicle being driven by Edward Hayes crossed the center line of U.S. Highway 69 and collided head-on with Koller's truck. Koller and two passengers in Hayes' vehicle suffered personal injuries. The present litigation involves Koller's[1] effort to obtain compensation from his insurance carrier defendant Liberty Mutual Fire Insurance Company. In this regard, it is undisputed that Koller has already obtained compensation from two other sources.

First, Hayes was insured by State Farm Insurance by a policy with liability limits of $50,000 per person and $100,000 per occurrence. Inasmuch as there were no serious questions regarding Hayes' negligence, State Farm extended its $100,000 policy limits to the three injured claimants (including Koller) and a distribution was agreed upon whereby Koller received $47,000.

---

[1] Tammy Koller, Koller's wife, is also named as a plaintiff.

Second, Koller was covered by the workers' compensation insurance maintained by Yellow Transportation, Inc. Ultimately, Koller received workers' compensation benefits totaling $47,136.42, with the added proviso that medical benefits required during Koller's lifetime "for treatment related to this injury" would remain "open and available." Although Koller, thus, has received $94,136. 42 from Hayes' insurer and workers' compensation, he nonetheless contends that he has not been fully compensated for the injuries he sustained in the December 23, 2008 accident.

At the time of his accident, Koller was insured by Liberty Mutual under policy number A02-243-389119-75 8 2 ("the A02 policy"). The A02 policy provided Koller with underinsured motorist (UIM") coverage with liability limits of $100,000 per person and $300,000 per occurrence. The Declarations page for the A02 policy list four different vehicles covered by the insurance. In part, in this lawsuit, Koller argues that he may combine or "stack"[2] the limits for each vehicle covered by the A02 policy (thus providing $400,000 in coverage for any one person injured in any one accident). Presently pending before the Court is Liberty Mutual's motion for partial summary judgment on this issue as well as on the issue of whether Liberty Mutual is entitled to an offset for damages paid to Koller under the Missouri worker's compensation law.

There is no question that, in issuing the A02 policy, Liberty Mutual included an anti-stacking provision. Specifically, the A02 policy explicitly states:

---

[2] Stacking is a term-of-art in insurance litigation and generally refers to "an insured's ability to obtain multiple insurance coverage benefits for an injury either from more than one policy, as where the insured has two or more separate vehicles under separate policies, or from multiple coverages provided for within a single policy, as when an insured has one policy which covers more than one vehicle." *Niswonger v. Farm Bureau Town & Country Ins. Co. of Mo.*, 992 S.W.2d 308, 313 (Mo. App. [E.D.] 1999).

> The limit shown in the Schedule or in the Declaration (*i.e.*, $100,000 per person and $300,000 per occurrence) . . . is our maximum limit of liability for all damages for "bodily injury resulting from any one accident. This is the most we will pay regardless of the number of . . . Vehicles or premiums shown in the Schedule or in the Declarations.

Insurance agreements are contracts and, as such, courts enforce insurance policies according to their unambiguous terms. *Seeck v. Geico General Insurance Co.*, 212 S.W.3d 129, 132 (Mo. 2007) (*en banc*). On the other hand, <u>if</u> "policy language is ambiguous, it must be construed against the insurer." *Id*. (*quoting Gulf Insurance Co. v. Noble Broadcast*, 936 S.W.2d 810, 814 (Mo. 1997) (*en banc*)). In construing the terms of an insurance policy, Missouri law requires a court to apply the meaning which would be attached by an ordinary person of average understanding if purchasing insurance – resolving ambiguities in favor of the insured. *Seeck*, 212 S.W.3d at 132.[3] Thus, the issue before the Court comes down to whether the A02 policy – construed as a whole[4] – is ambiguous.

---

[3] In addition to contract interpretation rules of construction, insurance agreements are also subject to various rules arising from public policy. For instance in Missouri, it violates public policy to include anti-stacking provisions in insurance policies that relate to <u>uninsured</u> motorist coverage. *See*, *e.g.*, *Cameron Mutual Insurance Co. v. Madden*, 533 S.W.2d 538, 544-45 (Mo. 1976) (*en banc*). However, with regard to UIM coverage, Missouri courts have not recognized a blanket prohibition based on public policy and have concluded that the ability to stack UIM coverage (or, alternatively, to enforce anti-stacking provisions related to UIM coverage) must be "determined by the contract entered between the insured and the insurer." *Farm Bureau Town Insurance Co. of Mo. v. Barker*, 150 S.W.3d 103, 106 (Mo. App. [W.D.] 2004).

[4] As noted recently by the Missouri Supreme Court, "[c]ourts should not interpret policy provisions in isolation but rather evaluate policies as a whole." *Ritchie v. Allied Property & Casualty Insurance Co.*, 307 S.W.3d 132, 135 (Mo. 2009) (*en banc*).

With regard to ambiguity over stacking, Koller argues that the "excess" provision of the "Other Insurance" clause in the A02 policy creates a right to stack coverages and, thus the A02 policy is ambiguous. *Compare Lutsky v. Blue Cross Hospital Services, Inc.*, 695 S.W.2d 870, 875 (Mo. 1985) (*n banc*) ("If a contract promises something at one point and takes it away at another, there is an ambiguity."). In relevant part, the "Other Insurance" clause provides:

> If there is other applicable insurance available under one or more policies or provisions of coverage that is similar to the insurance provided by this endorsement:
> . . . .
> 2. Any insurance we provide with respect to a vehicle you do not own shall be excess over any collectible insurance providing coverage on a primary basis.

Koller argues that this provision permits Liberty Mutual to provide "excess" coverage when an insured (like Koller) is injured while operating a vehicle he did not own (as happened to Koller). Several Missouri cases have considered such an argument, but one in particular is critical to the issue before the Court – *Ritchie v. Allied Property & Casualty Insurance Co.*, 307 S.W.3d 132 (Mo. 2009) (*en banc*).

In *Ritchie*, the claimants sought to stack UIM coverage after an accident involving a non-owned vehicle. The policy involved contained an anti-stacking provision similar to the one contained in the A02 policy in this case. Specifically, the *Ritchie* policy stated:

> The limit of liability shown in the Declarations . . . is our maximum limit of liability for all damages for "bodily injury" resulting from any one accident. This is the most we will pay regardless of the numbers of . . . Vehicles or premiums shown in the Declarations.

*Id.* at 136-37.[5] The *Ritchie* court then noted:

---

[5] By comparison, as previously quoted, the A02 policy provided:

> The limit shown in the Schedule or in the Declaration . . . is our maximum limit of liability for all damages for "bodily injury resulting

4

> Considered in isolation, the limit of liability provision . . . could be interpreted to prohibit stacking to the extent [it states] that the "limit of liability shown in the declarations for each person for Underinsured Motorists coverage is our maximum limit of liability."

*Id*. at 137. However, the court noted that consideration also had to be afforded to the "Other Insurance" provisions of the subject policy. In pertinent part, that part of the policy provided:

> If there is other applicable underinsured motorists coverage available under one or more policies or provisions of coverage:
> . . .
> 2.  Any coverage we provide with respect to a vehicle you do not own shall be excess over any other collectible underinsured motorist coverage.

*Id*. at 137.[6] The court concluded that, in viewing the insurance policy as a whole, "the policy's anti-stacking provisions, which might normally and otherwise apply, do not apply in the special situation where the insured is injured while occupying a non-owned vehicle." *Id*. at 137-38 (*quoting Niswonger v. Farm Bureau Town & Country Insurance Co. of Mo.*, 992 S.W.2d 308, 315 (Mo. App. [E.D.] 1999)). Therefore, because the "Other Insurance" language "could be

---

> from any one accident. This is the most we will pay regardless of the number of . . . Vehicles or premiums shown in the Schedule or in the Declarations.

[6] Again, by comparison, as previously quoted, the A02 policy stated:

> If there is other applicable insurance available under one or more policies or provisions of coverage that is similar to the insurance provided by this endorsement:
> . . . .
> 2.  Any insurance we provide with respect to a vehicle you do not own shall be excess over any collectible insurance providing coverage on a primary basis.

5

reasonably interpreted as superceding the limit of liability language," an ambiguity existed that, by law, had to be resolved in favor of the insureds. *Id*. at 138.

Liberty Mutual argues that the Court should not follow the holding in *Ritchie*, but should rely on a previous Missouri court of appeals decision – *Farm Bureau Town & Country Insurance Co. of Mo. v. Barker*, 150 S.W.3d 103 (Mo. App. [W.D.] 2004). *Barker* also involved a claimant attempting to stack UIM coverage following an accident involving a non-owned vehicle. The claimants in *Barker* also argued that the "Other Insurance" provisions in their policy countermanded the explicit anti-stacking clause in their policy. The court in *Barker*, however, disagreed.

Liberty Mutual urges the Court to reach the same conclusion as the court in *Barker* because the "excess" language in the subject policy used "language virtually identical" to that used in the A02 policy. It is true that the "excess" language in *Barker* provided:

> Any insurance we provide with respect to a vehicle you do not own will be excess over any collectible insurance providing coverage on a primary basis.

*Id*. at 107. While in this case, the A02 policy provides:

> Any insurance we provide with respect to a vehicle you do not own shall be excess over any collectible insurance providing coverage on a primary basis.[7]

---

[7] The "excess" language in *Ritchie* provided:

> Any coverage we provide with respect to a vehicle you do not own shall be excess over any other collectible underinsured motorist coverage.

*Ritchie*, 307 S.W.3d at 137.

Notwithstanding the similarity of the language used in the A02 policy and the *Barker* policy, however, the Court is not persuaded that the reasoning of the *Barker* court still represents Missouri law. In *Ritchie*, the insurance company sought to rely on *Barker*. The Missouri Supreme Court did note the difference in language between the policies in *Richie* and *Barker* and noted that the language in *Ritchie* was "more likely to create the impression that underinsured motorist coverages can be stacked when injury occurs in a non-owned vehicle." *Ritchie*, 307 S.W.3d at 139. The Court reads this statement to merely mean that the policy in *Ritchie* was more ambiguous than the policy in *Barker*, not that the *Barker* policy was unambiguous. Indeed, the *Ritchie* court goes on to hold:

> In any event, no other court has cited *Barker* in any of the numerous underinsured motorist decisions since it was handed down. To the extent *Barker* is inconsistent with [*Seeck v. Geico General Insurance Co.*, 212 S.W.3d 129, 132 (Mo. 2007) (*en banc*)] and the cases *Seeck* cites with approval, it no longer should be followed.

*Id*. The *Ritchie* court noted that in their prior decision in *Seeck*, they had found an insurance policy ambiguous because it contained the following "Other Insurance" provision:

> When an insured is occupying a motor vehicle not owned by the insured ... this insurance is excess over any other insurance available to the insured and the insurance which applies to the occupied motor vehicle is primary.

In light of the similarity between this language and the language in *Barker* (and the language in the A02 policy), the Court does not find *Barker* to be persuasive authority in the aftermath of *Ritchie* and the Missouri Supreme Court's (at least) partial abrogation of *Barker*.

This is an action before the Court based on diversity of citizenship. In such a case, the Court must follow state law as announced by the highest court in the state. *Erie Railroad Co. v.*

7

*Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822 (1938). To the extent that lower Missouri appellate decisions are inconsistent with a decision of the Missouri Supreme Court, this Court must follow the law as announced by the state's highest court "unless there are very persuasive grounds for believing that the state's highest court no longer would adhere to [it]." *Bennett v. Hidden Valley Golf and Ski, Inc.*, 318 F.3d 868, 877 (8th Cir. 2003) (*quoting* 19 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4507, at 145-47 (2d ed.1996)). When a state's highest court has not decided an issue, it is the task of this Court to predict how the state supreme court would resolve the issue. *United Fire & Casualty Insurance Co. v. Garvey*, 328 F.3d 411, 413 (8th Cir. 2003). Based on the holding and the reasoning in *Ritchie*, the Court believes that the Missouri Supreme Court would find the A02 policy ambiguous as to the ability to stack when an insured is injured while operating a non-owned vehicle. As such, under Missouri law, the insurance contract *viz-a-viz* stacking is construed against Liberty Mutual and stacking is permitted under the facts of this case.

Also pending before the Court on cross motions for summary judgment is the issue of any set-off for the workers' compensation benefits received by Koller. In that regard, the "Limit of Liability" portion of the A02 policy, in part, provides:

> We will not make a duplicate payment under this coverage for any element of loss for which payment has been made by or on behalf of persons or organizations who may be legally responsible. . . .
>
> We will not pay for any element of loss if a person is entitled to receive payment for the same element of loss under any of the following or similar law:
>
> 1. Worker's compensation law; or
>
> 2. Disability benefits law.

8

On its face, then, the A02 policy would seemingly bar Koller from collecting compensation under the policy to the extent he has previously collected workers' compensation benefits. In response, Koller, citing *American Family Mutual Insurance Co. v. Ragsdale*, 213 S.W.3d 51 (Mo. App. [W.D.] 2006), argues that the "excess" clause in the "Other Insurance" provision of the A02 policy creates an ambiguity that must be construed against Liberty Mutual. The Court disagrees.

In *Ragsdale*, the subject policy stated that "[t]he limits of liability of this coverage shall be reduced by . . . [a] payment or amount payable by or on behalf of any person or organization which may be liable [or a] payment under any workers' compensation or disability benefits law." *Id*. at 53-54. On its face, the *Ragsdale* policy sought to reduce the liability caps set out in the policy. As the court noted in *Ragsdale*, if the "limit reduction" language quoted above were applied, then, in the some cases, an insured might be entitled to no coverage. *Id.* at 55-56. For instance, if the insured had $100,000 in underinsurance coverage, but had received $100,000 in workers compensation benefits, the insured would, in reality, have no underinsurance coverage even if his loss exceeded $100,000. The *Ragsdale* court concluded that this was contrary to the "Other Insurance" provision of the subject policy which provided:

> [A]ny insurance provided under this endorse for an insured person
> while occupying a vehicle you do not own is excess over any
> similar insurance.

*Id*. at 54. The contrary provisions in the policy created an ambiguity that had to be construed against the insurer. *Id*. at 57.

The workers' compensation set-off provision in the A02 policy is far different from that at issue in *Ragsdale*. The set-off provision at issue herein would merely prevent an insured from obtaining benefits for those elements of compensation that he has previously collected on. For instance, in this case, assuming that stacking sets Koller's liability limit at $400,000:

- if Koller has $300,000 in damages from the December 23 accident, he would be entitled to $205,863.58 in underinsurance benefits ($300,000 less the $47,0000 – to establish the amount of underinsuarnce – then less $47,136.42 in a workers' compensation set-off), or

- if Koller has $600,000 in damages from the December 23 accident, he would be entitled to $400,00.00 in underinsurance benefits ($600,000 less the $47,0000, then less $47,136.42, still leaves Koller with a deficiency of $505,863.58, meaning that Liberty Mutual would pay the stacked liability limit)

The set-off in the A02 policy does not lessen Liberty Mutual potential liability limit ($400,000), but merely prevents Koller from a double recovery, *i.e.,* Koller may recover for the amount of his underinsurance up to the limit of $400,000.

Although the Court does not find *Ragsdale* determinative on the set-off issue in this case under this policy, the question remains as to whether the "excess" clause in the "Other Insurance" provision of the A02 policy creates an ambiguity preventing Liberty Mutual from applying a workers' compensation set-off. The Court finds that the Missouri Supreme Court decision in *Ritchie* again provides the answer.

In *Ritchie*, after the court found (as in this case) that an "excess" clause created an ambiguity as to stacking, the court considered whether the subject policy in the case also created an ambiguity as to the insurer's right to set-off collected by the plaintiffs from the tortfeasors. The policy in question – like the policy in *Ragsdale* – provided that the "limit of liability shall be reduced by all sums [paid] by or on behalf of persons or organizations who may be legally responsible." *Ritchie*, 307 S.W.3d at 140. The *Ritchie* court found that this provision was ambiguous when contrasted with the policy's assurances regarding the total limit of liability (*e.g.*, "we will pay up to the limits of liability shown in the schedule"). *Id*. However, the court concluded that "an alternative construction" could be placed on the set-off provision:

> In stating that the limit of liability shall be reduced by all sums paid because of bodily injury or by or on behalf of persons or organizations who may be legally responsible, [the provision] simply means that in determining the total damages to which the underinsured motorist coverage will be applied, the amount of money already received from the tortfeasor must be deducted. In this way, it avoids a double recovery.

*Id*. at 141 (*internal citations and punctuation omitted*). Applying this interpretation to the policy, the *Ritchie* court concluded:

> [The plaintiffs] suffered $1.8 million in damages, and received only $60,000 from the tortfeasors. Deducting this $60,000 from the $1.8 million in damages still leaves unsatisfied damages of $1.74 million. This is far more than the [stacked] policy limits. Accordingly, [the insured] must pay its full policy limits of $300,000.

*Id*.

In this case, the language in the A02 policy is even more in line with the reasoning in

*Ritchie*. Moreover, the application of the set-off advocated by the Missouri Supreme Court is also the interpretation urged by Liberty Mutual herein. As such, the Court concludes that Missouri law would interpret the workers' compensation set-off provision in the A02 policy to simply mean that in determining the total damages to which the underinsured motorist coverage will be applied, the benefits received by Koller from workers' compensation[8] must be deducted. As thus interpreted, the Court finds no ambiguity on this issue in the A02 policy.

Accordingly, it is

**ORDERED** that *Defendant's Motion For Partial Summary Judgment*, filed November 30, 2010 [Doc. 19] is **DENIED** to the extent it seeks to prohibit stacking of the underinsured motorist limits but **GRANTED** to the extent it seeks an off-set or credit from the total damages for any element of loss that plaintiff has received or is entitled to receive under Missouri's worker's compensation law.

                                     */s/ John T. Maughmer*
                                    **JOHN T. MAUGHMER**
                                   **U. S. MAGISTRATE JUDGE**

---

[8] The parties have not briefed and the Court expresses no opinion as to the extent the "open" future medical benefits awarded Koller under workers' compensation impact the "value" of the workers' compensation set-off under the A02 policy.